IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16 CR 273 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | GOVERNMENT'S SENTENCING |
| MICHAEL A. HAGAR, | ) | MEMORANDUM |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney for the Northern District of Ohio, and Daniel J. Riedl and Om M. Kakani, Assistant United States Attorneys, and hereby submits this sentencing memorandum setting forth the United States' position regarding sentencing for Defendant Michael A. Hagar. For the reasons set forth below, and those to be articulated at the sentencing hearing, the United States respectfully submits that a sentence of 180 months is appropriate in this case. The government argues that the advisory United States Sentencing Guidelines range of 121 to 151 months of imprisonment underrepresents the severity of the defendant's conduct and that an upward departure and/or variance from the advisory guideline range is appropriate.

I. **FACTUAL BACKGROUND**

Defendant Michael A. Hagar ("Hagar") was convicted after a jury trial of cyberstalking and sending interstate threatening communications. The evidence proved that Hagar, after being fired from Goodyear and Eaton, contrived supposed grievances with those companies and sent hundreds of emails to employees of Goodyear, Eaton, and several law enforcement officials. In particular, Hagar sent emails to R.G., who worked in the same building as Hagar at Eaton. These

emails were part of an ongoing course of conduct intended to threaten, harass, and intimidate R.G. and cause her substantial emotional distress.  During the course of Hagar's campaign against R.G., Eaton and Goodyear, he was contacted a number of times by local law enforcement who attempted to stop his offensive conduct; instead of heeding this warning, Hagar continued to send threatening communications to his victims and began including local law enforcement in his emails.  After enduring several months of torment R.G. obtained a court-issued restraining order against Hagar, and he was served with that same order directing him to refrain from all communication with R.G.  However, he ignored the court's order and continued to send emails to her, her coworkers, and her family in which he repeatedly claimed a "right to create apprehension" in her and her associates.

In two of the emails, Hagar threatened to shoot numerous people, including R.G., her aunt in Beachwood, Ohio, Eaton employees and local law enforcement.  When a search warrant was executed at his home, Hagar was found in possession of four handguns, two rifles, and more than 9,000 rounds of ammunition.  He also possessed an Army Field Manual and *The Ultimate Guide to US Army Combat Skills, Tactics and Techniques*.  In his closet hung only a camouflage jacket, a shoulder holster, and a black backpack.  After he was told to stay away from Goodyear's property, he traveled to a Goodyear store where he was arrested.  After he was fired from Eaton's Portland center, Hagar was seen near the building on multiple occasions.  After he was arrested for trespassing on Goodyear property, Hagar even targeted local prosecutors in Portland, Oregon, leaving them numerous threatening emails and voicemails, and went so far as to send one prosecutor, M.M., pictures of herself and a document containing information on her family's prior home addresses.  Based on Hagar's actions, many of the individuals to whom he sent the emails were afraid for their personal safety.  Moreover, both Goodyear and Eaton

suffered a substantial disruption of business functions or services, and substantial expenditure of funds to respond to Hagar's threatening actions. Hagar's words and conduct illustrate his intent to leave his keyboard and carry out the threats he made.

## II. LAW AND ARGUMENT

The applicable statutory mandatory minimum sentence for Hagar's conviction for cyberstalking (Count 1) is one year, pursuant to Title 18, United States Code, Section 2261(b)(6), as the jury returned a special verdict finding that Hagar committed the offense in violation of a temporary stalking protective order. (R. 107: **SEALED** PSR, PageID 1148). Additionally, the correct calculation of the advisory United States Sentencing Guidelines results in a range of 121 to 151 months to life imprisonment. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range." Gall v. United States, 552 U.S. 38, 49 (2007). Appellate courts must review a district court's sentence for procedural and substantive reasonableness. Id. at 51. Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range. Id.

The United States agrees with the calculations set forth in the final Presentence Investigation Report ("PSR"), but believes that an upward variance and/or departure is appropriate for the reasons set forth below. The government requests that the Court sentence Hagar to a sentence of 180 months in light of the sentencing factors enumerated under 18 U.S.C. Section 3553(a), addressed below.

### A. ADVISORY GUIDELINES CALCULATION

A final PSR issued on May 24, 2019, finding a final adjusted offense level of 32 and a Criminal History Category I, for a guideline range of 121 to 151 months. (R. 107: **SEALED** PSR, PageID 1166). The government has no objections to the PSR, as it correctly

calculates the advisory sentencing guidelines range. First, the report calculates a total offense level of 32. This results from a base offense level of 12 pursuant to U.S.S.G. § 2A6.1(a)(1), and the application of a 6 level enhancement pursuant to § 2A6.1(b)(1) since Hagar's actions demonstrated an intention to carry out the threats; a 2 level enhancement under § 2A6.1(b)(2)(A) since the offense involved more than two threats; a 2 level enhancement under § 2A6.1(b)(3) since Hagar continued to threaten one of the victims after the issuance of a protection order; a 4 level enhancement under §§ 2A6.1(b)(4)(A) or (B) since Hagar's actions caused a substantial disruption of business operations for Goodyear and Eaton; and a 6 level Official Victim enhancement under § 3A1.2(a) and (b). (Id., PageID 1160). The result is a total offense level of 32. (Id.). Hagar went to trial and has not in any way demonstrated an acceptance of responsibility, so no such reduction is appropriate. Finally, Hagar's Criminal History Category is properly determined to be I. (Id., PageID 1162).

With a total offense level of 32 and criminal history category of I, Hagar's range calculates to 121 to 151 months imprisonment. The statutory maximum sentence for Counts 1, 2 and 3 is 5 years. If those sentences are run consecutively, the maximum total sentence becomes 180 months.

        B.      <u>REQUEST FOR UPWARD DEPARTURE</u>

As noted throughout, the Guidelines calculation does not adequately consider the extent of the psychological and emotional harm and distress caused by Hagar's conduct. The government respectfully requests an upward departure pursuant to U.S.S.G. §§ 5K2.3, 2A6.1 and 2A6.2.

Application Note 4 to U.S.S.G. § 2A6.1 notes that:

> (A)    In General.—The Commission recognizes that offenses covered by this guideline may include a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in the offense

4

level.  Factors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted.  See Chapter Five, Part K (Departures).

(B)  Multiple Threats, False Liens or Encumbrances, or Victims; Pecuniary Harm.—If the offense involved (i) substantially more than two threatening communications to the same victim, (ii) a prolonged period of making harassing communications to the same victim, (iii) substantially more than two false liens or encumbrances against the real or personal property of the same victim, (iv) multiple victims, or (v) substantial pecuniary harm to a victim, an upward departure may be warranted.

These grounds for an upward departure exist in the present case.  While specific offense characteristic U.S.S.G. § 2A6.1(b)(2)(A) grants a two level increase because the offense involved two or more threats that were made, this guideline insufficiently reflects the thousands of messages sent by Hagar to his victims.  While only some of the messages make the direct threat that Hagar would shoot someone, the government introduced dozens of messages (and witnesses testified to many more) referencing violence and warfare.  Those messages were reasonably understood by the victims to be a veiled threat.  For example, as M.E. testified regarding Government's Exhibit 117, ". . . you start to see some very angry approach words like "vengeance," "punishment," all caps, exclamation points, pretty, pretty threatening."  (R. 104: Transcript, PageID 775).

Hagar also engaged in a prolonged period of making harassing communications to the same victim.  While there were many instances of Hagar harassing victims for an extended period of time, the most glaring example is that of R.G. who Hagar harassed from December of 2015 until the time of his arrest in June of 2016.  Finally, Hagar's conduct caused substantial pecuniary harm to his victims, resulting in hundreds of thousands of dollars spent protecting employees and dealing with the aftermath of his behavior.  (R. 107: PSR, PageID 1153-59).

5

> Similarly, Application Note 5 to U.S.S.G. § 2A6.2 notes that:
>
> If the defendant received an enhancement under subsection (b)(1) but that enhancement does not adequately reflect the extent or seriousness of the conduct involved, an upward departure may be warranted. For example, an upward departure may be warranted if the defendant stalked the victim on many occasions over a prolonged period of time.

Additionally, U.S.S.G. § 5K2.3 allows the Court to depart upward in cases where a victim suffered extreme emotional harm from the defendant's conduct where:

> [T]here is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns.

All the above factors are present here, especially in the case of R.G. The trial record clearly establishes that Hagar stalked R.G. numerous times over a prolonged period. Whereas she once prided herself because she "always strived to be a confident and friendly person to those around [her]," Hagar's conduct caused her to change her behavioral, emotional and psychological functioning in her work and social life as she "found [her]self more unsure of how to act around strangers [and] stopped trusting others and co-workers." [R. 107: Final PSR, PageID 1153]. She further "felt unsafe in her own apartment and work place" and lived at a friend's house for over a month because she had "nightmares frequently when [she] slept in [her] own bed." [*Id*., PageID 1154]. Defendant's prolonged conduct took not just a mental but also a physical toll on R.G., as she was forced to take several weeks of sick leave because of numerous anxiety attacks that made her "sick to my stomach and weak." [*Id*.]. That Hagar continued in his efforts to create apprehension and fear in R.G. even though R.G. never acknowledged his months and months of unsolicited Facebook messages and after she sought help from local law enforcement and the court system is also extremely troubling and telling of the type and lasting nature of the harm he caused. Those avenues and resources that should have helped her and

6

protected her meant nothing to Hagar, and he let her know it repeatedly, causing her lasting fear and harm.

These are not transient effects. Rather, they are lasting scars that continue to plague R.G., as she "continue[s] to see the mental, physical and emotional impact" that Hagar's conduct has had on her; conduct that continues to make her "question [her] worth and self-esteem;" conduct that affected the quality of her work and her relationships with her friends; conduct that created "fear [that] haunts" her and from which she "will never fully heal." [*Id.*, PageID 1153-54].

R.G. only presents one aspect of Hagar's far-reaching, destructive and disabling conduct. His offenses also affected other Eaton and Goodyear employees, like J.R., M.E., and R.D., who all voiced clear concerns for their families safety and well-being, suffered emotional, behavioral and physical reactions to Hagar's prolonged siege, and were forced to take extreme measures such as hiring armed security to protect their homes and purchasing weapons when they had never previously owned any.

The facts here are chillingly similar to those in United States v. Bowker and other disturbing stalking cases. 372 F.3d 365, 390-391 (6th Cir. 2003), citing United States v. Otto, 64 F.3d 367, 371 (8th Cir. 1995), and United States v. Miller, 993 F.2d 16, 21 (2d Cir. 1993). In Bowker the Sixth Circuit upheld a district court's upward departure for a defendant's prolonged terror campaign against a television anchor for the extreme emotional, physical, psychological and behavioral effects it had on her. Id. The victim's family in other states were targeted, and she was left with an extreme sense of paranoia and fear, including of retribution by the defendant. Id. These factors are all similarly present with the case of R.G., who also fears reprisal once Hagar is released from prison and has suffered numerous, lasting behavioral and

7

emotional changes in her lifestyle.  See also United States v. Loew, 364 Fed. App'x 33 (9th Cir. 2010); United States v. Walker, 665 F.3d 212 (1st Cir. 2011).

Accordingly, due to the prolonged and repeated conduct at stake here, and because of the long-lasting and far-reaching harms Hagar imposed upon his victims, this Court should depart upwards pursuant to U.S.S.G. §§ 2A6.2, Cmt. n. 5, and 5K2.3 in sentencing Hagar. Alternatively, the Court should consider the extent of the above harms in weighing the 18 U.S.C. § 3553(a) factors and vary upwards from the advisory guidelines range as the Guidelines do not adequately account for the actual harms Hagar caused.

### C.    THE COURT SHOULD IMPOSE CONSECUTIVE SENTENCES

Consecutive sentences are permissible, and consistent with the United States Sentencing Guidelines.  Because the sentence called for under the sentencing guidelines exceeds the maximum punishment of one of the offenses of convictions, the sentencing guidelines call for the offenses to be "stacked," or run consecutively in order to reach the advisory guidelines sentence.  See U.S.S.G. § 5G1.2(d);[1] United States v. Colbert, 977 F.2d 203, 206-07 (6th Cir. 1992); Jenkins v. United States, 394 F.3d 407, 411-12 (6th Cir. 2005).  Here the properly calculated advisory guidelines sentence is 121 to 151 months.  The maximum punishment for each of Counts 1, 2 and 3 is 60 months, well below the advisory guidelines range.  U.S.S.G. §5G1.2(d) then provides for stacking the sentences for these counts to reach a total of 180 months, which becomes the advisory guidelines sentence.  Thus, consecutive sentences are consistent with the sentencing guidelines.

---

[1] U.S.S.G. § 5G1.2(d) provides in relevant part:  "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."

ARGUMENT

Although the sentencing guidelines call for consecutive sentences, they are advisory in nature. In determining whether to impose consecutive or concurrent sentences, the Court must consider the factors at 18 U.S.C. § 3553(a), as it would for any sentence. See 18 U.S.C. § 3584(b) ("The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)."). Based on the analysis of the section 3553(a) factors below, consecutive sentences are appropriate in this case because of the seriousness of Hagar's conduct.

D. TITLE 18, UNITED STATES CODE, SECTION 3553(a) FACTORS

Based on the calculations described herein, as well as the recommended guidelines range from the final revised presentence investigation report, the government submits that the correct guidelines range is 121 to 151 months imprisonment. A sentence within this range is not sufficient to comply with the factors listed in 18 U.S.C. § 3553(a). As the Court is well aware, in determining the particular sentence to be imposed, the Court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed -
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentences and the sentencing range . . . ;
(5) any pertinent policy statement . . . ;
(6) the need to avoid unwarranted sentencing disparities among defendants with similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). Although the Court must consider all of these factors, in this case, the most pertinent are the nature and circumstances of the offense, the history and characteristics of the defendant, the need to protect the public, and the sentencing range established by the sentencing guidelines.

        1.      <u>The Nature and Circumstances of the Offense.</u>

ARGUMENT

First, the nature of circumstances of the offenses support a sentence of 180 months. The PSR provides a thorough and detailed description of the relevant conduct in this case that need not be repeated in full here. The Court also heard extensive evidence at trial detailing Hagar's offenses that also need not be repeated. However, certain aspects of this case deserve special consideration by the Court when fashioning an appropriate sentence.

ARGUMENT

        2.      <u>The History and Characteristics of the Defendant</u>

The Court should also consider Hagar's personal history and characteristics. Hagar has no prior adult criminal history. (R. 107: \*\*SEALED\*\* PSR, PageID 1162). He earned a bachelor's degree in Anthropology from George Mason University. (<u>Id.</u>, PageID 1164). He reported a positive childhood, and has a history of being employed. (<u>Id.</u>, PageID 1163-65).

The Sixth Circuit has previously noted that these types of personal characteristics are discouraged from being overly relied upon at sentencing. <u>See</u> <u>United States v. Robinson</u>, 669 F.3d 767, 775 (6th Cir. 2012). However, to the extent that the Court decides to give them weight, these facts are arguably just as supportive of a significant sentence as a lenient one. The reason is that Hagar had many of the advantages here that other defendants do not, and yet he still chose to commit these offenses. He had a good upbringing, he had the opportunity to attend college and earn a bachelor's degree, and he is not burdened by a past criminal history.

ARGUMENT

    3.    <u>The Need to Protect the Public</u>

A long sentence is also needed to protect the public from Hagar. The offenses of conviction were not the result of a single poor decision. To the contrary, Hagar chose to commit thousands of criminal acts over the course of nearly two years. He was told repeatedly by his victims and by law enforcement to stop his threatening conduct and yet his behavior continued. He was served with a restraining order telling him to have no contact with R.G. and his behavior only escalated.

Hagar poses a real and imminent threat to the community. He did not limit his stalking and threatening behavior to typing words on a keyboard. Instead he showed up repeatedly at his former employers' property. At his home, he collected an arsenal of weapons and ammunition including four handguns, two rifles, and more than 9,000 rounds of ammunition. He was also in possession of an Army Field Manual and The Ultimate Guide to US Army Combat Skills, Tactics and Techniques. In his closet hung only a camouflage jacket, a shoulder holster, and a black backpack. These items were not assembled by Hagar to place fear in the hearts of his victims, but to shoot and kill them. The actions of Oregon law enforcement in arresting him when they did likely averted an unspeakable tragedy. Hagar's own words and demeanor on the witness stand demonstrate his continued hostility towards those he feels "wronged" him. Only a lengthy prison sentence can continue to protect the public and ensure that such a tragedy does not yet materialize.

ARGUMENT

    4.    <u>The Applicable Sentencing Guidelines Range</u>

The Court must consider—indeed, must start with—the advisory sentencing range determined by the application of the United States Sentencing Guidelines. 18 U.S.C. §

11

3553(a)(4); <u>Gall</u>, 552 U.S. at 49-50. As outlined in the PSR, the sentencing guidelines call for a sentence of 121-151 months. There is ample reason for the Court to find that this sentence is insufficient to satisfy the § 3553(a) factors and to vary upwards from this sentence. Hagar has shown no remorse. There are no mitigating factors that would support a downward variance and, as discussed above, many aggravating factors that support an upward variance. Hagar should therefore be sentenced to an above-guideline sentence.

## III. CONCLUSION

Based on consideration of the advisory sentencing guidelines range and the Section 3553(a) factors identified above, the government respectfully requests this Court sentence Hagar to sixty (60) months on each count of conviction to be run consecutively for a total one-hundred and eighty (180) month sentence.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:   /s/ Daniel J. Riedl
Daniel J. Riedl (OH: 0076798)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3669
(216) 685-2378 (facsimile)
Daniel.Riedl@usdoj.gov

/s/ Om M. Kakani
Om M. Kakani (NY: 4337705)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3756
(216) 685-2378 (facsimile)
Om.Kakani@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of June, 2019, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

/s/ Daniel J. Riedl
Daniel J. Riedl
Assistant U.S. Attorney