IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. 1:16 CR 00273 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE DONALD C. NUGENT |
| ) | |
| MICHAEL HAGAR, ) | |
| ) | **MEMORANDUM OF OPINION** |
| Defendant. ) | **AND ORDER** |

### I. INTRODUCTION

This matter is now before the Court on *Defendant's Motion for Return of Property* (ECF #165), filed by Defendant Michael Hagar ("Hagar") on March 22, 2023, upon the exhaustion of all appeals, (ECF #164), following his conviction at a jury trial in March 2019 on a charge of cyberstalking in violation of a protective order, in violation of 18 U.S.C. §§ 2261A(2)(B) and 2261(b)6) (Count 1 of Superceding Indictment, ECF #77, PageID #240-241), and two counts of making a threatening communication in interstate commerce, in violation of 18 U.S.C. § 875(c) (Counts 2 and 3 of Superseding Indictment, ECF #77, PageID #241-242).  Hagar's convictions related to his use of the internet to harass and threaten employees of Goodyear Corporation ("Goodyear") and Eaton Corporation ("Eaton"), as well as State of Oregon law enforcement officials, after Hagar was fired from, respectively, Goodyear in 2013 and Eaton in 2015.  (ECF

#77, PageID #237-240). Plaintiff, United States of America, has filed an objection and opposition to Hagar's motion. (ECF #169).

In his motion, Hagar seeks the return of property collected by the Federal Bureau of Investigation ("FBI") from his residence at the time of his arrest in July 2016 (ECF #9, Return of Arrest Warrant). The property consists of numerous items of "firearm" property, as well as many items of personal property, all identified in a four-page itemized list attached as Exhibit 1 to *Government's Objection to Defendant's Motion for Return of Property* (ECF #169-1, PageID #1636-1639). The firearm property is identified as:

1. One (1) Beretta 9mm pistol, Model 92FS, Serial H81159Z;

2. One (1) holster, green in color originally in gun case with Beretta;

3. Two (2) 9mm 15 rounds magazines originally in gun case with Beretta;

4. One (1) Ruger .22 caliber pistol, Model: Mark III, Serial 271-29157;

5. Two (2) empty 10 rounds magazines and a scope mount originally in gun case with Ruger;

6. Three (3) empty magazines;

7. Eighty-seven (87) rounds .45 caliber ammunition;

8. One (1) EAA .357 magnum pistol, serial 1083458;

9. Six (6) rounds .38 caliber ammunition originally in the EAA .357 magnum pistol;

10. One (1) disassembled AR15 rifle;

11. One (1) bag AK-47 parts;

12. Three hundred (300) rounds of Winchester 9mm ammunition;

13. Two hundred(200) rounds of Federal .45 caliber ammunition;

14. Fifty (50) rounds of Lellie & Bellot .45 caliber ammunition;

15. Twenty (20) rounds of Norinco 7.62x39 caliber ammunition;

16. Multiple unknown caliber rounds of ammunition with eighteen (18) unknown caliber magazines;

17. Four (4) rounds of 7.62x39 caliber ammunition; and

18. Two (2) boxes of gun parts.

(ECF #169, PageID #4-5, as summarized in *Government's Objection to Defendant's Motion for Return of Property*).[1]

In addition to the above-listed firearm property, Hagar also seeks the return of many items of personal property, including computer equipment and other materials used by Defendant Hagar to engage in the offense conduct resulting in his convictions. (ECF #169-1).[2]

In his renewed motion (as he did in his earlier motion), Hagar stated that, if his motion is granted, "he will sign over ownership of his firearms to his father." (ECF #165, PageID #1616).

Plaintiff, United States of America, filed an objection to Hagar's motion on April 4, 2023 (ECF #169). The matter is now ready for ruling.

The Court has reviewed the record before it, the arguments and briefing of the parties, and the applicable law. For the reasons set forth below, *Defendant's Motion for Return of*

---

[1] Shortly after Hagar's conviction, his trial counsel filed a previous *Defendant's Motion for Return of Property* seeking return of the same property. (ECF #136). The United States opposed the motion. (ECF #137). The Court thereafter denied Hagar's motion, noting that Defendant could refile after all appeals had been exhausted. (ECF #138).

[2] The United States has indicated that it intends to return Item 13 on the four-page chart attached to its pleading (a T-Mobile Hot Spot device), Item 14 (a Canon printer), and Item 77 (a green holster) on the condition that Defendant Hagar provide the name, address, and contact information of a designee to receive these items. (ECF #169, PageID #1627 n.2).

*Property* (ECF #165) is DENIED.

## II. PERTINENT FACTS

The evidence presented at trial related to Defendant Hagar's criminal conduct leading to his convictions was outlined in the *Government's Sentencing Memorandum*, filed on June 4, 2019 (ECF #110):

> Defendant Michael A. Hagar ("Hagar") was convicted after a jury trial of cyberstalking and sending interstate threatening communications. The evidence proved that Hagar, after being fired from Goodyear and Eaton, contrived supposed grievances with those companies and sent hundreds of emails to employees of Goodyear, Eaton, and several law enforcement officials. In particular, Hagar sent emails to R.G., who worked in the same building as Hagar at Eaton. These emails were part of an ongoing course of conduct intended to threaten, harass, and intimidate R.G. and cause her substantial emotional distress, During the course of Hagar's campaign against R.G., Eaton[,] and Goodyear, he was contacted a number of times by local law enforcement who attempted to stop his offensive conduct; instead of heeding this warning, Hagar continued to send threatening communications to his victims and began including local law enforcement in his emails. After enduring several months of torment[,] R.G. obtained a court-issued restraining order against Hagar, and he was served with that same order directing him to refrain from all communication with R.G. However, he ignored the court's order and continued to send emails to her, her coworkers, and her family in which he repeatedly claimed a "right to create apprehension" in her and her associates.
>
> ***In two of the emails, Hagar threatened to shoot numerous people, including R.G., her aunt in Beachwood, Ohio, Eaton employees[,] and local law enforcement. When a search warrant was executed at his home, Hagar was found in possession of four handguns, two rifles, and more than 9,000 rounds of ammunition. He also possessed an Army Field Manual and The Ultimate Guide to US Army Combat Skills, Tactics and Techniques.*** In his closet hung only a camouflage jacket, a shoulder holster, and a black backpack. After he was told to stay away from Goodyear's property, he traveled to a Goodyear store where he was arrested. After he was fired from Eaton's Portland center, Hagar was seen near the building on multiple occasions. After he was arrested for trespassing on Goodyear property, Hagar even targeted local prosecutors in Portland, Oregon, leaving them numerous threatening emails and voicemails, and went so far as to send one prosecutor, M.M., pictures of herself and a document containing information on her family's prior home address. Based on Hagar's actions, many of the individuals to whom he sent the emails were afraid for their personal safety. Moreover, both Goodyear and Eaton suffered a substantial

> disruption of business functions or services, and substantial expenditure of funds to respond to Hagar's threatening actions. Hagar's words and conduct illustrate his intent to leave his keyboard and carry out the threats he made.

(ECF #110, PageID #1197-1199) (emphasis supplied).

After Hagar's sentencing, at which he was sentenced to 60 months imprisonment on each of Counts 1, 2, and 3 of the Superseding Indictment (to be served consecutively for a total term of 180 months), followed by three years of supervised release, (ECF #111 [Minutes of Proceedings], ECF #112 [Judgment] & ECF #114 [Amended Judgment]), Hagar filed an appeal raising various challenges to his conviction and sentence (ECF #115 [Notice of Appeal]).

The U.S. Court of Appeals for the Sixth Circuit affirmed this Court's rulings in all respects. *United States v. Hagar*, 822 F. App'x 361, 364 (6th Cir. 2020) (ECF #139 [Court Only], PageID #1328). In its decision, the court of appeals described the firearms at issue in this motion, as well as other related evidence collected from Hagar's residence:

> Oregon police searched Hagar's residence following the "SHOOT" threats. There they found four handguns, two rifles (an AR-15 and an AK-47), thousands of rounds of ammunition, two U.S. Army field training manuals discussing attack tactics, extended magazines, two shoulder holsters, a backpack, and handwritten notes on Eaton personnel, including on C.B. and R.G., as well as the names of R.G.'s mother, father, and sister. Hagar's personal notes on C.B. and R.G. included "location information."

*United States v. Hagar*, 822 F. App'x 361, 366 (6th Cir. 2020) (ECF #139 [Court Only], PageID #1331).[3]

By his motion, Hagar now asks this Court to return all of the personal property collected

---

[3] Among bookmarked passages found within one of the Army field training manuals was the following: "The tactician cannot ignore the human aspect. He seeks to recognize and exploit indicators of fear and weakness in his enemy, and to defeat the enemy's will, since soldiers remain key to generating combat power." *See United States v. Hagar*, 822 F. App'x 361, 366 n.1 (6th Cir. 2020) (ECF #139 [Court Only], PageID #1331 n.1).

from his home upon his arrest, including the "firearm" property.

The danger presented to the community if Hagar's motion were to be granted is evident from the record. His stated intention to "sign over" possession and ownership of his firearms to his father does not change the analysis.

At Hagar's sentencing hearing, this Court noted the extreme seriousness of the criminal offense activity comprising Hagar's harassment and threats to his victims:

> *[T]his offense goes beyond the pale . . . . [T]here's been no physical injury, but the mental stress and mental injury to the victims is more than I've seen in my lifetime*. And if I have to reflect the seriousness of the offense in the sentence and deter criminal conduct, I think the maximum sentence is appropriate. And the public has to be protected from what you did, and I just heard here again, I heard your testimony . . . . *And I don't see any remorse. I don't see any acceptance of responsibility for acting badly and committing crimes*. Nothing. . . . And so *I don't see any reassurance that if you were on the street, that the public would be protected at all. In fact, I see just the opposite*.

(ECF #135 [Transcript of Sentencing Hearing], PageID #1315) (emphasis supplied). In affirming Hagar's sentence, the court of appeals referenced and noted its agreement with this Court's sentencing findings. *United States v. Hagar*, 822 F. App'x 361, 373-74 (6th Cir. 2020) (ECF #139 [Court Only], PageID #1334, 1343-46).

In the court of appeals' decision affirming this Court's rulings, it further described the danger to the community Hagar posed, and likely will pose upon his release after sentence, by referencing the victim impact statements provided by R.G., J.R. (another Eaton employee target of Hagar's threatening emails), and Goodyear, stating:

> Both R.G. and J.R. worry that Hagar will continue to be a danger upon his release. R.G. stated that *"Hagar terrorized and tormented me, and others for months with the sole purpose of taking any feeling of security away*. I continue to see the mental, physical, and emotional impact that he has had on me . . . ." She also said that Hagar "changed my 'normal' life to one full of fear." She stated that although therapy and self-defense classes have helped with her anxiety, *I fear when he is*

-6-

> *released, he will continue to be a danger to myself and others.* His lack of remorse at the trial, and his inability to accept any guilt concerns me. *I realize that I might not be able to hide from him and that fear haunts me. I also worry about my family. He made it very clear that he knows how to find them.* I know that I will never fully heal from this but I hope that with more time and the comfort of knowing that he is in custody, I may be able to find some peace.

*United States v. Hagar*, 822 F. App'x 361, 367 (6th Cir. 2020) (ECF #139 [Court Only], PageID #1334) (emphasis supplied).

The pertinent facts surrounding this case, and Hagar's motion, compel a finding that issuing an order denying Hagar's motion is appropriate.

### III. LAW AND ANALYSIS

While 18 U.S.C. § 922(g) bars a convicted felon from possessing firearms, or recovering them, it does not divest the felon of *all* ownership rights. Section 922(g) allows a convicted felon a limited right to *transfer* ownership rights to confiscated firearms (without recovering them) to a third party "*unless it would allow the felon to later control the guns, so that he could either use them or direct their use.*" *Henderson v. United States*, 575 U.S. 622, 624 (2015) (emphasis supplied). Such is the case here. Defendant Hagar's motion, seeking to transfer ownership of the firearm property to his father, fails the test set forth in *Henderson*.

In *Henderson*, the defendant was charged with a felony offense of distributing marijuana. 575 U.S. at 624. As a condition of his bail, Henderson was required to surrender all of his firearms, which he did, to the custody of the FBI. *Id.* Thereafter, Henderson pleaded guilty to the distribution charge and, as a result of that conviction, he was prevented from legally possessing firearms under 18 U.S.C. § 922(g). *Id.*

Following his release from prison, Henderson asked the FBI to transfer the guns to his friend R.R., who had agreed to purchase them for an unspecified price. *Id.* The FBI denied the

request, explaining in a letter to Henderson, that "the release of the firearms to [R.R.] would place you in violation of [§ 922(g)] as it would amount to constructive possession of the guns." *Id.* (inserts supplied).

Henderson then filed a motion with the district court that had handled his criminal case seeking release of the firearms. *Id.* He asked for an order, invoking the court's equitable powers, directing the FBI to transfer the guns either to his wife or to R.R. *Id.* The district court denied the motion, concluding that Henderson could not "transfer the firearms or receive money from their sale" without "constructive[ly] possess[ing]" them in violation of § 922(g). *Id.* (quotations and inserts in original). The U.S. Court of Appeals for the Eleventh Circuit affirmed on the same ground. *Id.*

On appeal to the Supreme Court, the Court, addressing a circuit split on whether section 922(g) categorically prohibits a court from approving a convicted felon's request to transfer firearms to a third person, disagreed with a categorical rule, but instead held that a convicted felon has a right to dispose of his firearms in ways that *guarantee* he never uses them again:

> What matters instead is whether the felon will have the ability to use or direct the use of his firearms after the transfer. That is what gives the felon constructive possession. Accordingly, a court facing a motion like Henderson's may approve the transfer of guns consistently with § 922(g) ***if, but only if, that disposition prevents the felon from later exercising control over those weapons, so that he could either use them or tell someone else how to do so***.

*Id.* at 630 (emphasis supplied).

In *Henderson,* the Court recognized the importance of scrutinizing requests for firearm transfers, and specifically cited as an example a case where a request to transfer the firearms to a felon's parents appeared to indicate a sham transfer. *Id.* at 630-31, citing *State v. Fadness*, 363 Mont. 322, 341-42, 268 P.3d 17, 30 (2012) (upholding a trial court's finding that the assurances

-8-

given by a felon's parents were not credible). In reaching this conclusion, the Court stated:

> A felon cannot evade the strictures of § 922(g) by arranging a sham transfer that leaves him in effective control of his guns. And because that is so, a court may no more approve such a transfer than order the return of the firearms to the felon himself.

*Henderson*, 575 U.S. at 627.

According to the Presentence Investigation Report ("PSR") in this case, Defendant Hagar's legal address is in Flower Mound, Texas. (ECF #107 SEALED, PageID #1149). Defendant's father, Richard Edward Hagar, also resides in Flower Mound, Texas ((ECF #107 SEALED, PageID #1163). Defendant proposes that possession of his firearms be transferred to his father in Flower Mound, Texas. (ECF #165). The proposed transfer of the firearms to Defendant Hagar's father appears to be precisely the type of transfer which will likely result in Defendant Hagar retaining constructive possession of the firearms.

A motion for return of property, including a request for the return of firearm property, draws upon the equitable authority of the courts. *Henderson*, 575 U.S. at 625-26.

Defendant's *Motion for Return of Property* (ECF #165) is a motion made under Federal Rule of Criminal Procedure 41(g), and is treated as a civil action in equity when, as here, the owner of the property invokes the rule after the conclusion of criminal proceedings. *United States v. Dusenberry*, 201 F.3d 763, 768 (6th Cir. 2000); *United States v. Duncan*, 918 F.2d 647, 654 (6th Cir. 1990).

> Rule 41(g) provides:
>
> Motion to Return Property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district court where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose

reasonable conditions to protect access to the property and its use in later proceedings. FED. R. CRIM. P. 41(g).[4]

At the trial of this case, this Court heard evidence relating to Hagar's threats and his ability to carry out those threats with the firearms he owned and possessed. On appeal, in concluding that this Court properly admitted Hagar's firearms and ammunition at trial, the court of appeals noted:

> Admission of the firearms and ammunition found in Hagar's residence was not an abuse of discretion because the evidence was directly relevant to the elements of the cyberstalking charge and the interstate threats charges. As to the interstate charges, ***Hagar sent emails to the victims stating that he intended to shoot them. Possession of firearms and ammunition was direct evidence that his threats to shoot his victims were "true threats" to injure and not "merely idle or careless talk."*** *See* 18 U.S.C. § 875(c); *United States v. Howard*, 947 F.3d 936, 943 (6th Cir. 2020). Hagar's ability to carry out his threats to shoot people was certainly a fact "of consequence in determining" whether the communications were true threats. *See* Fed. R. Evid. 401. Violent threats go hand-in-hand with firearms and ammunition. *See, e.g., United States v. Newell*, 309 F.3d 396, 401 (6th Cir. 2002) (holding that the defendant's possession of firearms made his threats to carry out his violent threats "more than mere puffery") (cleaned up).

*United States v. Hagar*, 822 F. App'x 361, 371-72 (6th Cir. 2020) (ECF #139 [Court Only], PageID #1341) (emphasis supplied).

For a district court to grant a Rule 41(g) motion, the owner of the subject property must have clean hands. *See Gaudiosi v. Mellon*, 269 F.2d 873, 881-82 (3d Cir. 1959) (stating that "No principle is better settled than the maxim that he who comes into equity must come with clean hands and keep those hands clean throughout the pendency of the litigation, and that if he violates

---

[4] The property at issue was obtained by the FBI pursuant to an arrest warrant issued by a magistrate judge of the U.S. District Court for the Northern District of Ohio. (ECF #2 [Court Only]). *See* FED. R. CRIM. P. 41(b)(5) ("a magistrate judge having authority in any district where activities related to the crime may have occurred, . . . may issue a warrant for property that is located outside the jurisdiction of any state or district, but within . . . a United States territory, possession, or commonwealth").

this rule, he must be denied all relief whatever may have been the merits of his claim") (citations omitted).

Here, Hagar's PSR recognized some of his property as "specific offense characteristics" of his offense conduct, which impacted the sentencing guideline computation as follows:

> **Specific Offense Characteristics:** Pursuant to USSG § 2A6.1(b)(1), *since the defendant's actions demonstrated an intention to carry out the threats (he possessed numerous firearms, military tactic manuals, a shoulder holster, a map, and a backpack)* the offense level is increased by six levels.

(ECF #107 SEALED, PageID #1160, ¶ 32) (emphasis supplied).

Here, there is no question that Defendant Hagar owned the firearms, ammunition, and other items of property at issue, and that he owned and possessed them during a time when he was threatening to shoot his victims. Defendant Hagar, in his motion, comes to this Court with "unclean hands." His motion hardly supports entitlement to equitable relief. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815 (1945) (the "clean hands" maxim "necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant"); *see also Art Metal Works v. Abraham & Straus*, 70 F.2d 641, 646 (L. Hand, J., dissenting) ("The doctrine [of unclean hands] is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge").

As noted in the record, (ECF #135 [Transcript of Sentencing Hearing], PageID #1315), and as recognized and affirmed on appeal, *United States v. Hagar*, 822 F. App'x 361, 373-74 (6th Cir. 2020) (ECF #139 [Court Only], PageID #1334, 1343-46), Defendant Hagar's threatening offense conduct was "beyond the pale," and did shock the moral sensibilities of this Court. His

words and conduct demonstrated his intent to carry out his violent threats, and the firearm and other property seized from him showed that he had the firearms and ammunition to do it. The record further shows that the victims of Defendant Hagar's threats remain fearful of his eventual release from custody. Returning Hagar's firearms and ammunition to his father, who lives in the same city as Defendant Hagar, where Hagar can easily exercise constructive possession of them, will only heighten these victims' legitimate fears.

The doctrine of unclean hands easily warrants denial of Hagar's motion. As the Sixth Circuit has noted, in *Bonner Farms, Ltd. v. Thomas A. Fritz, et al.*, 355 F. App'x 10 (6th Cir. 2009):

> "The 'clean hands doctrine' of equity requires that ***whenever a party takes the initiative to set in motion the judicial machinery to obtain some remedy but has violated good faith by prior-related conduct, the court will deny the remedy.***" *Marinaro v. Major Indoor Soccer League*, 81 Ohio App. 3d 42, 45, 610 N.E.2d 450, 452 (1991) (citing *Bean v. Bean*, 14 Ohio App. 3d 358, 363-364, 471 N.E.2d 785, 791-93 (1983)). "The application of the unclean hands defense 'depends upon the connection between the complainant's iniquitous acts and the defendant's conduct which the complaint relies upon as establishing the cause of action.'" *Wuliger v. Manufacturer Life Ins. Co.*, 567 F.3d 787, 797 (6th Cir. 2009) (quoting *McClanahan v. McClanahan*, 79 Ohio App. 231, 72 N.E.2d 798, 800 (1946)). Accordingly, ***this rule does not require the plaintiff to be a saint in all of its affairs, but only "that the plaintiff must not be guilty of reprehensible conduct with respect to the subject matter of [its] suit."*** *Marinaro*, 81 Ohio App. 3d at 45, 610 N.E.2d at 452 (citing *Kinner v. Lake Shore & Michigan S. Ry. Co.*, 69 Ohio St. 339, 69 N.E. 614 (1904)).

*Bonner Farms*, 355 F. App'x at 16-17 (emphasis supplied).

Here, where Hagar seeks return of the very property he possessed to make his threats real, his motion fails any test related to "unclean hands."

In addition to the firearms property, including ammunition, Hagar also seeks the return of other property recovered from his residence, including computers, computer equipment, and other materials used by Hagar to engage in the offense conduct for which he was convicted. Equity

-12-

supports the denial of Defendant Hagar's motion for the return of *any* of the property seized, though the government has indicated its intention to return certain items seized: Item 13 (T-Mobile Hot Spot device), Item 14 (Canon printer), and Item 77 (green holster), on the condition that Defendant Hagar provide the name, address, and contact information of a designee to receive these items (ECF #169, PageID #1627 n.2). See note 2, *supra*.

The record is clear that Defendant Hagar fails any conceivable test under the "unclean hands doctrine" for an order directing the government to return any of the requested property. Therefore, an order denying *Defendant's Motion for Return of Property* (ECF #165) is appropriate.

### IV. CONCLUSION

Accordingly, for each of the reasons stated in this *Memorandum of Opinion and Order*, *Defendant's Motion for Return of Property* (ECF #165) is DENIED.

IT IS SO ORDERED.

/s/ Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED: April 11, 2023